UNITED STATES DISTRICT COURT
for the
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

BRUCE JONES,

        Plaintiff,

    -against-

150 CENTRAL PARK SOUTH, INC., PATRICK
LAPPIN AND DANIEL R. KAPLAN

        Defendants

————————————————————————x

**VERIFIED COMPLAINT**

Case No.:_____
ECF Case

**DEMANDS A
TRIAL BY JURY**

Plaintiff, Bruce Jones, by his attorney, Felicia Nestor Esq., complaining of Defendants 150 Central Park South, Inc., Patrick Lappin and Daniel R. Kaplan alleges:

## NATURE OF ACTION

1.    This action is brought to remedy discrimination and harassment on the basis of race and/or color, and unlawful retaliation in violation of Section 1981 of the Civil Rights Act of 1871, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981 and the Administrative Code of the City of New York § 8-101 *et. seq.* (the "Administrative Code", "New York City Human Rights Law" or "NYCHRL"), and to remedy discrimination, harassment and retaliation on the basis of disability in violation of the NYCHRL.

2.    Bruce Jones, a former employee of 150 Central Park South, Inc., suffered discrimination and harassment by defendants because of his race and/or color. Defendants also retaliated against Mr. Jones after he sent a letter to the Board of Directors of 150 Central Park South, Inc. in November 2010, complaining of discriminatory treatment.  Defendants also discriminated against Mr. Jones based on disability, interfered

with his right to reasonable accommodation, and retaliated against him for seeking reasonable accommodation.   Defendants' discriminatory and retaliatory actions included, but were not limited to, unwarranted disciplinary actions, unwarranted terminations, and ultimately, deliberately forcing Mr. Jones to resign his position by arbitrarily changing his schedule to include hours that Defendants knew Mr. Jones could not work.

3.      Plaintiff seeks the following damages: declaratory relief, compensatory and punitive damages, attorneys' fees, and all other appropriate relief pursuant to federal and city law.

**JURISDICTION AND VENUE**

4.      Jurisdiction of this court is invoked pursuant to 28 U.S.C. §1331 and 1343.

5.      This Court's supplemental jurisdiction of Plaintiff's city law claims is invoked pursuant to 28 U.S.C. §1367.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c) because Defendant 150 Central Park South, Inc. owns and operates a building located in the Southern District of New York, and the acts and omissions giving rise to the causes of action complained of occurred therein.

**ADMINSTRATIVE PREREQUISITES**

7.      Contemporaneously with the filing of this Complaint, Mr. Jones has mailed a copy, along with a letter of explanation, to the New York City Commission on Human Rights and the Corporation Counsel of the City of New York, satisfying the notice requirements of the New York City Administrative Code §8-502(c).

**PARTIES**

8.      Plaintiff Bruce Jones ("Plaintiff" or "Jones") is a medium complected African-American male residing in Old Bridge, New Jersey who, at all times relevant to this lawsuit, performed work for Defendants as an engineer, in the City and State of New York.

9.      Defendant 150 Central Park South, Inc. ("Defendant" or "150 CPS,") owns a cooperative apartment building with the name "Hampshire House", which is located at 150 Central Park South, New York, New York, 10019.   The principal executive office of Defendant is also located within the Hampshire House building.  Hampshire House has 197 apartments and, at all times relevant to this complaint, has had a staff of over 15 employees who work in the coop building.

10.      At all times relevant to this suit, individual Defendant Patrick Lappin ("Defendant" or "Lappin") was the General Manager, a tenant-shareholder at Hampshire House, and a member of the Board of Directors of 150 CPS.  At all times relevant to this suit, individual Defendant Daniel R. Kaplan ("Defendant" or "Kaplan") was a tenant-shareholder at Hampshire House and Chairman of the Board of Directors of 150 CPS.  At all times relevant to this suit, Lappin and Kaplan had the power and authority to hire, fire, direct and discipline employees of Hampshire House, were Plaintiff's employers within the meaning of 42 U.S.C. § 1981 and CHRL § 8-102(5), and aided in and abetted the discrimination, harassment, and retaliation committed against Plaintiff.

**FACTUAL ALLEGATIONS**

11.      Plaintiff Bruce Jones began working occasionally at Hampshire House in 2000 or 2001 as a contract worker for Deem Plumbing, Inc.

3

**The Hampshire House employee environment**

12.    The advertising for Hampshire House promises prospective tenants "old world character, charm, and elegance". Characteristics of the Hampshire House environment indicate that remnants of de facto segregation are part of the "old world" that Defendants have preserved.

13.    At all times relevant to the complaint, the great majority of employees who comprised the "face" of the Hampshire House staff -- those employed in the lobby -- were Caucasian or light-skinned Hispanics: There were six Bellman, all light Hispanics; three Doormen, including one Caucasian and two light Hispanics; four Front Desk employees, including two Caucasian and two light Hispanics; and four Security Staff, including two light Hispanics, one brown Hispanic and one *light-skinned* African-American, who had originally been hired to work in the Packaging Department.

14.    The Packaging Department, located in the basement included three employees of middle east origin, one light Hispanic and one Caucasian. The supervisor of the Housekeeping Department was Caucasian; housekeeping staff included three dark or medium-complected African-Americans, one African, two brown Hispanics, and two light Hispanics.

15.    Other Hampshire House employees of color stated to Plaintiff that they were, and had long been, aware that Hampshire House managers positioned light-skinned employees in the front stations of the building. Plaintiff was also informed that Mr. Lappin had become upset when darker-skinned employees were brought from other departments to fill in when the lobby was short-staffed.

16.    In early 2003, when Plaintiff worked at Hampshire House as a contract plumber, the Engineering Department was staffed by five Caucasians and one African-American. Upon information and belief, the one African-American engineer resigned around the end of the summer in 2003, at approximately the same time that Plaintiff was offered a job by Hampshire House.

**Plaintiff was hired as a part-time engineer**

17.    In August 2003, Abraham Samadpour, the Chief Engineer, offered Plaintiff employment with Hampshire House. When Plaintiff informed Mr. Samadpour that he needed to continue working his day job, Mr. Samadpour offered Plaintiff a job working at Hampshire House for a part-time shift, working weekends and nights. Plaintiff accepted and Patrick Lappin approved the hire.

18.    Throughout his tenure at Hampshire House, Plaintiff continued to work his full-time day job and worked at Hampshire House on nights and weekends. Hampshire House managers were aware of Plaintiff's day job because it prevented him from attending the Engineer staffing meetings, which were held during the day. Hampshire House managers were also aware that they could not schedule Plaintiff for daytime shifts because of his day job.

19.    Between August 2003 and September 2006, Mr. Samadpour was Plaintiff's direct supervisor; in September 2006, Gerard Bruno became Plaintiff's direct supervisor. At all times relevant to the complaint, Mr. Lappin was Plaintiff's second-level supervisor. As General Manager, Mr. Lappin is either the direct or second-level supervisor of every employee at Hampshire House.

20.     Within two months of being hired by Hampshire House, Plaintiff applied for and became a member of the New York Hotel and Motel Trades Council, AFL-CIO ("the Union"), which had a collective bargaining agreement ("CBA") with Hampshire House, governing the employment of the Hampshire House engineers. Paul Malec, a Caucasian engineer, was the union delegate at Hampshire House. Pursuant to the CBA, union members can only be terminated after a formal hearing and a decision by the Impartial Chairman ("IC") that Hampshire House managers have demonstrated that the employee has been the subject of progressive discipline and has been terminated for "just cause". Plaintiff also became a union delegate, and under the CBA, Hampshire House would have had to continue to employ Plaintiff pending a decision by the IC.

**Discrimination against Plaintiff based on race and/or color**

21.     At all times relevant to the complaint, Plaintiff's immediate supervisor, Mr. Bruno, consistently gave Plaintiff good performance evaluations.

22.     In 2006, Plaintiff had been using his motorcycle to travel to Hampshire House. He had been parking it on the street, down the block from Hampshire House. Prior to November 2006, Plaintiff's motorcycle was stolen while it was parked in that location. Mr. Lappin was aware that Plaintiff's motorcycle was stolen. Plaintiff began parking his new motorcycle, on the street, near the entrance to Hampshire House, so that the Hampshire House doorman would be in view of anyone near the motorcycle. In November 2006, Mr. Lappin ordered Plaintiff to stop parking his motorcycle near the entrance to the building.

23.     Plaintiff objected to the order because he was parking his vehicle on public property, not on Hampshire House property, and because he parked near the building to prevent his vehicle from being stolen.

24.     The Union supported Plaintiff regarding the parking issue in order to prevent Mr. Lappin from being able to dictate an employee's actions outside of the workplace.

25.     Mr. Lappin's behavior towards Plaintiff changed decisively once Plaintiff engaged the union and refused to submit to Mr. Lappin's improper order.

26.     Upon information and belief, by contrast, Caucasian engineers engaged the union numerous times to challenge and limit Mr. Lappin's dictates, but Mr. Lappin's behavior did not similarly change towards them afterwards.

27.     Upon information and belief, beginning in 2007 and continuing until Plaintiff's constructive termination in September 2011, Mr. Lappin began intermittently ordering Mr. Bruno to take unwarranted disciplinary actions against Plaintiff, often for actions that did not violate Hampshire House rules. These unwarranted actions included termination or threats of termination, which were without warning and were in violation of the progressive discipline protocols required by the CBA.

28.     Regularly, in these situations, Mr. Bruno would dissociate himself from the unfounded warnings, as he was delivering them, by apologetically explaining to Plaintiff that he thought Mr. Lappin was "going crazy" or he didn't know why Mr. Lappin was having him take the disciplinary actions against Plaintiff.  In accordance with accepted procedure, Paul Malec was present to these discussions as the Union delegate.

29.     Upon information and belief, Mr. Lappin did not terminate any other Hampshire House engineer without cause and/or warning.

30.     Upon information and belief, Mr. Lappin did not subject engineers who were Caucasian or light-skinned Hispanics to the same undeserved disciplinary actions, nor violate established progressive discipline protocols when disciplining them,

31.     Each time Plaintiff was terminated by Mr. Lappin, it was in violation of the CBA, and Plaintiff was shortly thereafter reinstated and compensated for any back pay to which he was entitled.  To the extent that Mr. Lappin knew that he likely would not be able to sustain these disciplinary actions if Plaintiff challenged them, Mr. Lappin created a hostile work environment that significantly interfered with Plaintiff's employment.

32.     In addition to having Mr. Bruno issue unwarranted disciplinary warnings, between 2007 and September 2011, Mr. Lappin harassed Plaintiff by subjecting him to increased scrutiny.  On numerous occasions, employees notified Plaintiff that Mr. Lappin had called them to ask where Plaintiff was and what he was doing.  Mr. Lappin did not, as frequently, if at all, check up on Caucasian or lighter complected employees.

33.     Other Hampshire House employees noticed that Mr. Lappin was subjecting Plaintiff to extraordinary scrutiny and unwarranted terminations.  They remarked to Plaintiff that Mr. Lappin was intent on punishing Plaintiff and trying to "get rid of" him.

**Mr. Lappin's treatment of Caucasians was significantly better**

34.     Other Caucasian and light-skinned Hispanic employees, also under Mr. Lappin's supervision, have not been terminated, and may never have even been written up after committing violations greatly exceeding anything Plaintiff may have been guilty of.  For example, upon information and belief:

a)      In violation of the rule that employees are prohibited from fraternizing with tenants, at least one employee had an affair with a tenant. When managers learned of the violation, they issued explicit warnings to the employee. However, it was only when the employee violated multiple warnings that managers suspended him for one week.

b)      One employee frequently allowed a homeless woman to sleep in a Hampshire House office, despite the rule that employees are not to invite anyone onto the premises of Hampshire House.

c)      Several employees "lost" money from their banks, which they used to pay deliverymen on behalf tenants who would later reimburse Hampshire House, yet none were terminated.

d)      Many employees used in excess of their allotted sick days without any disciplinary or pay consequences.

35.    In particular, one Caucasian engineer was written up repeatedly, between September 2007 and May 2009, for, inter alia, leaving jobs half finished; losing work orders and failing entirely to do an assignment; sleeping in the generator room while on duty; taking Hampshire House keys (from an apartment and a public space) home with him and not returning them for days; leaving a tenant's keys in the apartment door and leaving for the night; handling property in a tenant's apartment without permission; physically threatening another employee; failing to punch out when he left work; repeated absenteeism from 2007 – 2009, including repeatedly using more than his allotted sick days, repeatedly coming in late for work and lunch breaks, even failing to show up at all after calling in late. This employee was repeatedly warned, intermittently

written up and suspended several times, yet was never terminated until a large collection

of repeated and ignored warnings *over the course of several years,* was first amassed.

### Specific, unwarranted disciplinary actions and harassment against Plaintiff

36.     On July 24, 2007, a private maid (not a member of Hampshire House's staff),

who was working in a tenant's apartment, notified the Hampshire House front desk that

she had seen a waterbug in her employer's apartment.  The front desk called Plaintiff to

remedy the situation despite the fact that pest extermination is not part of the engineers'

job description.

37.     Plaintiff searched throughout the basement for bug spray and, finding none,

called the maid to say that he could only come to the apartment with a broom.  She

requested that he do so.  When Plaintiff arrived at the apartment, the maid explicitly

informed him that the waterbug had disappeared and she did not know where it was at

that time. Plaintiff gave her the broom so that she could use it to kill the bug *if and when* it

reappeared.

38.     On July 30, 2007, with no warning, Mr. Lappin terminated Plaintiff "effective

immediately".  Mr. Lappin called an emergency meeting with the union, seeking to have

Plaintiff officially fired for not killing the bug himself, despite the fact that Plaintiff

explained that he had attempted to help but, when he arrived at the apartment, the

waterbug was no longer in sight.

39.     At the meeting to challenge the termination, Mr. Lappin could not

demonstrate that the termination of the Plaintiff was warranted or permissible under the

CBA, because *there had been no previous similar incidents, Plaintiff had not been issued any*

*warnings, verbal or written, and there had been no intermediary disciplinary actions, such*
*as suspension.* For these reasons, Plaintiff remained in his position.

40.    One month after the waterbug incident, in August 2007, Mr. Lappin had Mr.
Bruno issue another warrantless disciplinary action against Plaintiff, ostensibly because
Plaintiff did not have adequate tools to do the job.

41.    Plaintiff had previously loaned his own screwdriver to Mr. Lappin who did
not return it. When Mr. Lappin asked for another screwdriver on August 20, 2007,
Plaintiff did not have one because it was still in Mr. Lappin's possession.

42.    On August 28, 2007 Mr. Lappin had Mr. Bruno issue Plaintiff a disciplinary
warning, including a threat of termination, for failure to have adequate tools.

43.    In September 2008, Mr. Bruno issued Plaintiff a written warning for
excessive sick days after Plaintiff took sick leave for the ninth day that year. The
Hampshire House manual allots employees only seven sick days per year. Upon
information and belief, Caucasian and light-skinned employees have often exceeded their
allotment of sick days with no warnings or write-ups being made.

44.    In August 2010, a Hampshire House tenant called the engineering
department to have an engineer address potential leaks in her apartment because of a
rainstorm that day. Plaintiff answered the call and learned that the job would require that
he walk into the apartment. In order not to soil the floor, Plaintiff informed the tenant
that he needed to get "booties" to cover his work boots, and that he would return. The
tenant became angry, told Plaintiff to forget it and refused him entry.

45.    Upon information and belief, the tenant later made a complaint to Mr.
Lappin, after which Mr. Lappin had Mr. Bruno write a termination notice stating that

Plaintiff had refused to handle the tenant's service request.  Mr. Lappin did not ask Plaintiff for an explanation or initiate any investigation himself.

46.     In violation of the CBA, Mr. Lappin ordered Plaintiff to leave immediately.

47.     Within several days, Union representative Larry McNeil came to Hampshire House to meet with Mr. Lappin because of Mr. Lappin's violation of disciplinary protocols in terminating Plaintiff.  An investigation began, during which the tenant's personal driver, who had been witness to the discussion between the tenant and Plaintiff, corroborated Plaintiff's versions of events to several different interviewers.

48.     Upon information and belief, Mr. Lappin was deferential to this tenant, especially around this time, and took this action against Plaintiff, in part, to satisfy the tenant, as well as based on Mr. Lappin's own racial animus.

49.     During discussions about this matter, Mr. McNeil and Mr. Lappin got into a lengthy and heated discussion about whether Mr. Lappin's actions were motivated by discriminatory bias based on Plaintiff's race, because Mr. Lappin continued to treat Plaintiff differently than he did the other employees.

50.     When Mr. McNeil sought to allow the tenant to address the discrepancy between her version of events and the contradictory explanations provided by both Plaintiff and the tenant's driver, Mr. Lappin rescinded the termination, and Plaintiff was reinstated.

51.     In an attempt to appease the tenant, however, Mr. Lappin asked Plaintiff to stay away from Hampshire House for two weeks.

52.    No other engineer, and perhaps no other employee, had ever been asked to do that.  It was not an official suspension because Plaintiff received full pay, but Mr. Lappin would have been able to present it as such to the tenant.

53.    At some point around this time, before and/or after Plaintiff's "suspension", Plaintiff was told not to leave the basement to answer service calls anywhere else in the building.  This prevented Plaintiff from performing the duties of his job.  For several days, Mr. Lappin paid Mr. Malec, who is Caucasian, to work overtime so that Mr. Malec could answer those calls for service instead of allowing Plaintiff to perform those duties.

**Mr Lappin's continued discriminatory treatment and harassment harmed Plaintiff**

54.    Between 2007 and 2010, Plaintiff suffered stress and anxiety from Mr. Lappin's disparate treatment of him. In particular, Plaintiff suffered significant stress and anxiety because he did not know when Mr. Lappin would arbitrarily attempt to terminate him, since Mr. Lappin did not follow protocols in his management of Plaintiff.  Plaintiff also suffered embarrassment and humiliation in front of other employees who witnessed Mr. Lappin's abusive treatment of Plaintiff, knew about the unwarranted disciplinary actions, and opined that Mr. Lappin was trying to get rid of him.

55.    As a result of the August 2010 termination, followed by the "suspension" and relegation to the basement, Plaintiff's level of humiliation, anxiety and stress greatly increased.  Plaintiff began to withdraw and isolate himself from the other employees at Hampshire House, including Plaintiff's own stepson, who is also an employee at Hampshire House.  (Plaintiff's stepson is a light-skinned Hispanic).  Plaintiff often avoided making eye contact and speaking with other employees, who remarked to Plaintiff that, in effect, he was becoming anti-social.

13

56.    Mr. Lappin's continued harassment of Plaintiff caused Plaintiff to suffer increased mental anguish outside the confines of his job at Hampshire House.  Plaintiff gained weight.  The stress and anxiety caused by Mr. Lappin's harassment resulted in Plaintiff's loss of enjoyment of life, and greatly harmed, even precluded the intimacy that Plaintiff previously shared with his wife.  Plaintiff greatly decreased his interactions with other members of his family who lived in the New York City area.

**Plaintiff engaged in protected activity by opposing discrimination**

57.    At all times material hereto, Hampshire House's Employee Manual contained no information instructing employees what to do if they believed they were being discriminated against.

58.    On all or nearly all occasions when Mr. Bruno took an unwarranted action against Plaintiff, Plaintiff told Mr. Bruno that he believed he was being discriminated against by Mr. Lappin.  These complaints to Mr. Bruno did not result in the harmful treatment against Plaintiff being halted.

59.    On or around November 11, 2010, a Cease and Desist letter was sent to Defendant Daniel R. Kaplan, and copies were sent to all other members of the Board of Directors of 150 CPS, including Mr. Lappin.  The letter informed and complained to the Board members about Mr. Lappin's continued harassment and discriminatory treatment of Plaintiff, and demanded that it be stopped.

**Defendants' immediate retaliation against Plaintiff because of his protected activity**

60.    On November 16, 2010 Mr. Kaplan called Plaintiff's attorney to state that he received the cease and desist letter.  Mr. Kaplan made no other comment.

61.    Neither Mr. Kaplan, nor any other Hampshire House manager, sought more

information from Plaintiff or questioned him about the allegations in the Cease and Desist letter.   No effective action was taken to stop Mr. Lappin's discriminatory actions against Plaintiff.  Additionally, Mr. Kaplan did nothing to prevent the campaign of retaliation that Mr. Lappin initiated immediately thereafter. Mr. Kaplan also ratified, approved, directed, supported, allowed and/or condoned Mr. Lappin's subsequent discriminatory actions.

62.     Within six weeks of Mr. Kaplan's acknowledgment of receipt of the Cease and Desist letter, Mr. Lappin had Plaintiff's supervisor issue five unwarranted disciplinary actions against Plaintiff, four of which included the threat of termination.

63.     Indeed, also on November 16, 2010, Mr. Lappin had Mr. Bruno issue one disciplinary warning asserting that a "random review" of the lobby's security footage was conducted after a member of the Board of Directors (who would have also received a copy of the Cease and Desist letter) complained about employees hanging around in the lobby. The video showed Plaintiff to have been in the lobby on November 14, 2010

64.     Plaintiff had entered the lobby several times on November 14, 2010 to perform routine duties, as well as to answer a complaint about lack of heat in the lobby. He also exchanged a few pleasantries with lobby personnel.

65.     Upon information and belief, other employees spent much more time in the lobby than Plaintiff and were given no warnings or other disciplinary actions. Upon information and belief, a review of videotape would show that Plaintiff spent less time in the lobby than other employees.

66.     Despite the fact that no Hampshire House manager had previously counseled Plaintiff about his appearance and no explanation was provided, the

aforementioned disciplinary warning also threatened that "failing to maintain a professional level of appearance" could result in termination.

67.    Upon information and belief, Mr. Lappin had Mr. Bruno issue a second disciplinary warning with threat of termination to Plaintiff on November 16, 2010, for ostensibly having taken 12 sick days that year.

68.    Plaintiff was informed, in 2011, by Nellie Allison who worked in the Accounting Department, that the number of sick days on which that disciplinary warning was based, were based on a miscalculation, which overstated the number of sick days Plaintiff took that year.

69.    By November 16, 2010, numerous other employees had exceeded their sick day entitlement for the year, some in excess of Plaintiff, but those employees were not also issued disciplinary warnings.   Some were later given warnings written on Hampshire House stationary rather than on official disciplinary warning forms.

70.    At least one employee told Plaintiff that when Mr. Lappin delivered the letter, Mr. Lappin told the employee not to worry because he was just doing it to "cover his ass". Another employee chided and complained to Plaintiff that it was only because Plaintiff objected to being the only one to get the disciplinary warning, that the employee was then given a letter by Mr. Lappin.

71.    On December 7, 2010 another disciplinary action was initiated against Plaintiff, for allegedly leaving the building unattended and theft of company time, resulting in possible termination pending an investigation.  The warning was not issued once it was pointed out that:

a)      Plaintiff only left temporarily to park his car in the spot that another

Hampshire House employee would be vacating, and that other employees

routinely did this or similar things;

b)      Plaintiff was double parked in front of Hampshire House, remained

within view of the Hampshire House camera, had his radio, and could have re-

entered the building within 30 seconds, if he was called; and

c)      Mr. Lappin regularly had the one engineer on duty leave the building

unattended in order to walk Mr. Lappin's dog in Central Park for 45 minutes or

more.

72.      Despite the fact that the disciplinary warning about parking his car was

never officially issued, Plaintiff was deprived of a half hour of pay for this purported

transgression.

73.      After the Cease and Desist letter was sent, Mr. Bruno conveyed to Plaintiff

Mr. Lappin's instruction that Plaintiff never enter or leave the building through the front

door.  Plaintiff's shift ended at 11 p.m., by which time the service entrance would be

locked.

74.      No other similarly situated employee was instructed not to use the lobby.

75.      Mr. Lappin dropped this order only after Plaintiff informed Mr. Bruno that

he would not leave through the back door after 11 p.m. unless all other employees

received the same instruction.

76.      On the morning of Sunday, December 26, 2010, forecasters warned about a

coming blizzard and advised people not to travel.  Plaintiff wanted to have another

Hampshire House engineer come in early to relieve him before the roads became dangerous.

77.    Plaintiff followed procedure and first attempted to call his supervisor, Mr. Bruno, for permission to make the schedule change, by placing a call through the Hampshire House switchboard.  When Mr. Bruno did not answer his phone, Plaintiff left a voice mail message for him.

78.    Wanting to ensure that he could find another employee to cover for him, Plaintiff then contacted another Hampshire House employee to find out if he could and would be willing to come in early.

79.    The employee agreed to relieve Plaintiff.

80.    Plaintiff placed several more calls to Mr. Bruno, but never spoke with him directly.  It was the day after Christmas.

81.    While Plaintiff was waiting for Mr. Bruno's return call, Mr. Lappin suggested to Plaintiff that Plaintiff leave early because of the snow.

82.    On January 4, 2011, Mr. Lappin had Mr. Bruno issue Plaintiff a disciplinary warning for having arranged to leave early on December 26, 2010. There is *no* mention in the disciplinary warning of the historic blizzard.  It falsely states that Plaintiff simply "wanted to go home" and  "made no attempt to notify his supervisor or to leave word as to why he needed to leave".  Though unsupported by facts, the warning states that Plaintiff was not permitted to "alter or change his schedule if he feels ill."

83.    Another unwarranted disciplinary warning was issued on January 4, 2011 for events on December 26, 2010, pertaining to removal of snow from the sidewalk. The

disciplinary warning acknowledges corroboration of Plaintiff's exculpatory explanation, yet Plaintiff was still subjected to disciplinary action.

84.     On January 20, 2011, the Union sent a letter to Hampshire House Managers objecting to the continued harassment of Plaintiff and requesting that the unwarranted disciplinary warnings for December be rescinded.

85.     On February 2, 2011 Mr. Lappin informed the Union that he would not rescind the disciplinary warnings.

86.     On March 21, 2011 a disciplinary warning was written for Plaintiff's alleged use of the gym.

87.     Prior to the warning, Plaintiff and other employees used the gym without penalty.

88.     Mr. Lappin has since granted Caucasian and Hispanic employees permission to use the gym, and they have received no disciplinary warnings.  Upon information and belief, at least one light-skinned employee still regularly uses the gym and has never been disciplined for it.

89.     The six unfounded disciplinary warnings that Plaintiff received after the Cease and Desist letter increased Plaintiff's level of stress and anxiety at his job.

**Plaintiff requests reasonable accommodation for his disability**

90.     Plaintiff has osteoarthritis, a joint disorder, which occasionally causes severe inflammation and pain in his knees.  At these times, walking and standing are more difficult.  Plaintiff has required treatment several times for this condition.

91.     Hampshire House managers were aware of Plaintiff's condition.

92.    In 2005 and 2009, the treatment regimen ordered by Plaintiff's physician included a series of injections and reduced physical activity.  The treatment was successful and Plaintiff was able to return to a normal level of physical activity after several months.

93.    In 2005 and 2009, Plaintiff had sought and Hampshire House managers had provided reasonable accommodation, in the form of limited medical leave, because of Plaintiff's arthritis.

94.    Upon information and belief, Hampshire House managers also provided medical leave as reasonable accommodation for other employees.

95.    On or around March 30, 2011, Plaintiff visited his doctor because of severe pain in his knees.  After reviewing diagnostic tests, Plaintiff's physician again diagnosed Plaintiff's condition as osteoarthritis.  The physician ordered the same treatment regimen as in 2005 and 2009.

96.    In 2011, Plaintiff's physician again advised him against working two jobs, until the condition could be alleviated.

97.    At the time, Plaintiff held a supervisory position at his full-time day job, which was less physically strenuous than his job at Hampshire House.

98.    In order to reduce physical activity, Plaintiff again sought reasonable accommodation by putting in for medical leave from his part-time job at Hampshire House and continued to work at his day job, as he had in 2005 and 2009.

99.    Plaintiff intended to return to his job at Hampshire House, as he had in 2005 and 2009, as soon as he was cleared by his physician to resume normal activities.

100.    As in 2005 and 2009, Hampshire House did not pay Plaintiff a salary while he was out on medical leave.  On or around April 2, 2011 Hampshire House stopped paying Plaintiff a salary.

101.    Plaintiff provided documentation, signed by his physician, to Hampshire House, which indicated that he would not be able to return to work for one month.  This document was accepted by Hampshire House managers.  No manager sought more information from Plaintiff about his condition or his request for medical leave as a reasonable accommodation for his disability.

**Defendants failed to engage in a good faith interactive process and retaliation against Plaintiff's when he requested reasonable accommodation**

102.    Unlike in 2005 and 2009, Defendants made no effort to engage in a good faith interactive process.  Instead, upon information and belief, by the end of April 2011, Mr. Lappin had contracted with a private investigation firm for surveillance of Plaintiff.

103.    In early May, Plaintiff received the first in a series of injections.  On or around May 11, 2011, after seeing his doctor again, Plaintiff provided another doctor's note to Hampshire House saying that he would not be able to return to work until his next evaluation on June 8, 2011.

104.    Plaintiff provided documentation every time he saw his doctor for evaluation during medical leave and, each time, Hampshire House managers actions indicated that they accepted the documentation.

105.    Upon information and belief, on June 8, 2010, a private investigator posted outside of Plaintiff's home in Old Bridge, New Jersey, followed Plaintiff as he was leaving for work in his car.  Upon information and belief, four investigators followed Plaintiff that day.  Investigators photographed Plaintiff during his lunch hour.  Upon information and

belief, investigators also entered the Thurgood Marshall Courthouse, where Plaintiff was working with Pace Plumbing Corp., and asked the marshals on duty whether Plaintiff was working there. One marshal confirmed that Plaintiff was there but denied the investigators' requests to copy the security log and to "gain access to the worksite".

106.    At least one marshal informed Plaintiff that investigators informed the marshals that they were police officers, showed a federal marshal a badge and falsely told the marshal that they had a warrant for Plaintiff's arrest. Upon information and belief, marshals informed the investigators that they could not serve a state arrest warrant on federal property. There are and were no warrants for Plaintiff's arrest.

107.    Plaintiff had worked at that location for some time and had enjoyed a cordial, even friendly, relationship with the marshals. As a result of the investigators' actions and false statements, Plaintiff suffered humiliation and damage to his reputation. Marshals who had previously been friendly to Plaintiff began to treat Plaintiff differently and Plaintiff perceived that some marshals regarded him, thereafter, with suspicion.

108.    Plaintiff was very disconcerted by these events because he was unaware that Defendants had hired private investigators to follow him and he knew that there was no warrant for his arrest. Plaintiff suffered additional stress and anxiety because he did not know if or when the purported officers would return to the location or what they would do if they did return.

**Defendants terminate Plaintiff**

109.    On June 21, 2011, while Plaintiff was still on medical leave, Mr. Lappin falsely accused Plaintiff of "falsification of official company documents" and terminated him.

110. Plaintiff opposed the termination by engaging the union grievance process.

111. On July 6, 2011, Mr. Lappin met with representatives of the union before an official Arbitrator.

112. Upon information and belief, Mr. Lappin alleged that, by submitting forms on which Plaintiff's doctor had checked an option stating that Plaintiff would not be able to return to work until his next evaluation, Plaintiff falsified company documents.

113. Upon information and belief, Mr. Lappin falsely stated, during the meeting, that he had had no idea that Plaintiff had another job until informed of it by North Shore Investigations, Inc.

114. Mr. Lappin advocated that Plaintiff's termination stand. The Arbitrator determined that Defendants did not have sufficient cause to terminate Plaintiff. *For this reason only, Plaintiff's termination was rescinded.*

**Defendants constructively dismiss Plaintiff**

115. Within only several weeks of the arbitration, while Plaintiff was still on medical leave, Plaintiff heard from other employees at Hampshire House that Mr. Lappin was making plans to get rid of the part-time shift at Hampshire House. This would mean that Plaintiff would have to work daytime hours during the week. Upon information and belief, Mr. Lappin did this because his attempt to have Plaintiff terminated on the trumped up charge of "falsifying company documents" was unsuccessful. Defendants' hope was that the schedule change would force Plaintiff to leave his position at Hampshire House.

116. When Plaintiff returned to work, Defendants notified him of the schedule change. Under the CBA, the schedule change could not go into effect until two weeks after

Plaintiff came back from leave. Plaintiff notified Hampshire House managers that he would be forced to resign if they scheduled him for daytime hours during the week.

117.    Despite the full knowledge that Plaintiff would need to resign if he was required to work daytime hours for the Hampshire House during the week, Defendants refused to halt the shift change.  On September 20, 2011 Plaintiff could not work the new schedule that was assigned to him.  By requiring that Plaintiff work the new shift, Defendants constructively discharged Plaintiff from his position at Hampshire House.

118.    Defendants changed Plaintiff's schedule and constructively dismissed him because of his race and/or color, and/or in retaliation for Plaintiff's opposition of Mr. Lappin's discriminatory treatment of Plaintiff, and/or for Plaintiff's request for reasonable accommodation.

119.    After Plaintiff's resignation, Mr. Lappin told union delegate, Paul Malec, words to the effect of, "I got rid of Kofi and I got rid of Bruce. I'm doing good." Mr. Kofi was an African man who had recently been fired by Mr. Lappin. Mr. Malec told Plaintiff, that Mr. Lappin had started picking on Clarence, another African-American man who worked as a housekeeper at Hampshire House.

**Summary**

120.    Between 2007 and 2010, because of Plaintiff's race and/or color, 150 Central Park South, by and through Mr. Lappin, had begun subjecting Plaintiff to intermittent unwarranted discipline and harassment, including terminations and threats of termination, to which Caucasian and other lighter-skinned employees were not subjected.

121.    When Plaintiff opposed this discriminatory treatment with a Cease and Desist letter to the Board of Directors of Hampshire House, in November 2010, all Defendants immediately retaliated with an unprecedented campaign of unwarranted discipline, which continued until Plaintiff took medical leave. These actions, singly or together, would dissuade a reasonable employee from opposing, or supporting a charge of, discrimination.

122.    In April 2011, when Plaintiff requested limited medical leave, Defendants did not respond, as they had in 2005 and 2009, by providing this reasonable accommodation in good faith.  Instead, Defendants interfered with Plaintiff's exercise of his rights by immediately hiring a group of private investigators in order to manufacture "evidence" of Plaintiff's wrongdoing.  Investigators made false and serious allegations about Plaintiff at his daytime work site.  Defendants then used the investigators' materials in another attempt to terminate Plaintiff without cause.  In so doing, Defendants continued the unbroken campaign of retaliation they began in 2011 in response to Plaintiff's Cease and Desist letter; these actions would dissuade a reasonable employee from opposing, or supporting a charge of, discrimination.  In so doing, they also retaliated against Plaintiff for requesting reasonable accommodation, which is protected activity under the NYCHRL.  Defendants' actions would also dissuade a reasonable employee from exercising the right to reasonable accommodation.

123.    Within only several weeks of the arbitrator's determination that Defendants had no justification to terminate Plaintiff, Defendants began planning to change the work schedule for the Engineering Department so that it would require Plaintiff to work daytime hours.  Defendants did this specifically because they knew that Plaintiff could not

work the new hours because of his full-time job during the day and specifically to oust

Plaintiff because their previous discriminatory and retaliatory attempts to terminate him

with unwarranted disciplinary actions had failed.

124.    But for his race and color, and/or Plaintiff's disability, Defendants would

not have treated Plaintiff as poorly as they did.

## CLAIMS FOR RELIEF:

### FIRST CLAIM FOR RELIEF
### DISCRIMINATION BASED ON RACE AND/OR COLOR
### IN VIOLATION OF SECTION 1981 OF THE CIVIL RIGHTS ACT OF 1871, AS AMENDED
### BY THE CIVIL RIGHTS ACT OF 1991, 42 U.S.C. §1981

125.    Plaintiff repeats and realleges each and every allegation contained in

paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set

forth herein.

126.    Defendants subjected Plaintiff to discrimination, based on his race and/or

color, by taking actions including but not limited to multiple terminations, deprivation of

pay, and constructive discharge, in violation of 42 U.S.C. §1981.

127.    In taking the above described discriminatory actions, Defendants acted

with malice and reckless indifference to Plaintiff's rights under 42 U.S.C. §1981.

128.    Plaintiff has lost wages, other benefits and compensation, has suffered and

continues to suffer mental anguish, emotional distress, humiliation and other

compensable injuries as a result of Defendants' discriminatory practices.

### SECOND CLAIM FOR RELIEF
### DISCRIMINATION BY HARASSMENT AND HOSTILE WORK ENVIRONMENT
### BASED ON RACE AND/OR COLOR IN VIOLATION OF
### SECTION 1981 OF THE CIVIL RIGHTS ACT OF 1871, AS AMENDED BY
### THE CIVIL RIGHTS ACT OF 1991,  42 U.S.C. §1981

129.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set forth herein.

130.    Defendants harassed and interfered with Plaintiff's job performance and subjected him to an offensive, intimidating, and hostile work environment, based on his race and/or color, by taking actions including but not limited to subjecting him to increased scrutiny, unique instructions and standards, unwarranted disciplinary actions, multiple terminations, relegation to the basement, deprivation of pay, and constructive discharge, in violation of 42 U.S.C. §1981.

131.    In taking the above described discriminatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under 42 U.S.C. §1981.

132.    Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' discriminatory practices.

### THIRD CLAIM FOR RELIEF
### RETALIATION BASED ON RACE AND/OR COLOR
### IN VIOLATION OF SECTION 1981 OF THE CIVIL RIGHTS ACT OF 1871,
### AS AMENDED BY THE CIVIL RIGHTS ACT OF 1991, 42 U.S.C. §1981

133.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set forth herein.

134.    Defendants subjected Plaintiff to retaliation for protected activity, after receiving Plaintiff's November 2010 Cease and Desist letter, by taking actions including but not limited to subjecting him to increased scrutiny, unique instructions and standards,

unwarranted disciplinary actions, threats of termination, deprivation of pay, and constructive discharge, in violation of 42 U.S.C. §1981.

135.    In taking the above described retaliatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under 42 U.S.C. §1981.

136.    Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' discriminatory practices.

**FOURTH CLAIM FOR RELIEF**
**DISCRIMINATION BASED ON RACE AND/OR COLOR IN**
**VIOLATION OF THE NEW YORK CITY ADMINISTRATIVE CODE**

137.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set forth herein.

138.    Defendants subjected Plaintiff to discrimination based on his race and/or color, by taking actions including but not limited to multiple terminations, deprivation of pay, and constructive discharge, in violation of the New York City Administrative Code.

139.    In taking the above described discriminatory actions, Defendants acted with malice and reckless indifference to Plaintiff's right under the Administrative Code.

140.    Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' discriminatory practices.

**FIFTH CLAIM FOR RELIEF**
**DISCRIMINATION BY HARASSMENT AND HOSTILE WORK ENVIRONMENT**
**BASED ON RACE AND/OR COLOR IN**
**VIOLATION OF THE NEW YORK CITY ADMINISTRATIVE CODE**

141.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set forth herein.

142.    Defendants harassed and interfered with Plaintiff's job performance and subjected him to an offensive, intimidating, and hostile work environment, based on his race and/or color, by taking actions including but not limited to subjecting him to increased scrutiny, unique instructions and standards, unwarranted disciplinary actions, multiple terminations, relegation to the basement, deprivation of pay, and constructive discharge, in violation of the New York City Administrative Code.

143.    In taking the above described discriminatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under the New York City Administrative Code.

144.    Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' discriminatory practices.

### SIXTH CLAIM FOR RELIEF
### RETALIATION IN VIOLATION OF THE NEW YORK CITY ADMINISTRATIVE CODE

145.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set forth herein.

146.    Defendants subjected Plaintiff to retaliation for protected activity, after receiving Plaintiff's November 2010 Cease and Desist letter, by taking actions including but not limited to subjecting him to increased scrutiny, unique instructions and standards,

unwarranted disciplinary actions, multiple terminations, deprivation of pay, and

constructive discharge, in violation of the New York City Administrative Code.

147.    In taking the above described retaliatory actions, Defendants acted with

malice and reckless indifference to Plaintiff's rights under the New York City

Administrative Code.

148.    Plaintiff has lost wages, other benefits and compensation, has suffered and

continues to suffer mental anguish, emotional distress, humiliation and other

compensable injuries as a result of Defendants' discriminatory practices.

**SEVENTH CLAIM FOR RELIEF**
**DENIAL OF REASONABLE ACCOMMODATION IN VIOLATION**
**OF THE NEW YORK CITY ADMINISTRATIVE CODE**

149.    Plaintiff repeats and realleges each and every allegation contained in

paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set

forth herein.

150.    Defendants denied Plaintiff's right to reasonable accommodation by failing

to engage in a good faith interactive process to determine if it could reasonably

accommodate Plaintiff's disability, and instead hiring a private investigator to follow

Plaintiff, and by harassing, terminating and constructively discharging him when he

sought reasonable accommodation for his disability, in violation of The New York City

Administrative Code.

151.    In taking the above described discriminatory actions, Defendants acted

with malice and reckless indifference to Plaintiff's rights under the New York City

Administrative Code.

152.    Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' discriminatory practices.

### EIGHTH CLAIM FOR RELIEF
### RETALIATION FOR PLAINTIFF'S EXERCISE OF PROTECTED RIGHTS IN VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE

153.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set forth herein.

154.    Defendants retaliated against Plaintiff, after he sought reasonable accommodation for his disability, by failing to engage in a good faith interactive process to determine if it could reasonably accommodate Plaintiff's disability, and instead hiring a private investigator to follow Plaintiff, and by harassing, terminating and constructively discharging him when he sought reasonable accommodation for his disability, in violation of The New York City Administrative Code.

155.    In taking the above described discriminatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under the New York City Administrative Code.

156.    Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' discriminatory practices.

### NINTH CLAIM FOR RELIEF
### AIDING AND ABETTING IN VIOLATION OF THE NEW YORK CITY ADMINISTRATIVE CODE

157.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set forth herein.

158.    Defendant Daniel Kaplan knowingly or recklessly aided or abetted the unlawful employment practices and/or discrimination against Plaintiff, described above and committed by Defendant Patrick Lappin, in violation of the New York City Administrative Code.

159.    In taking the above described discriminatory actions, Defendant Daniel Kaplan acted with malice and reckless indifference to Plaintiff's rights under the Administrative Code.

160.    Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendant Daniel Kaplan's discriminatory practices.

## TENTH CLAIM FOR RELIEF
### INTERFERENCE WITH PROTECTED RIGHTS
### IN VIOLATION OF THE NEW YORK CITY ADMINISTRATIVE CODE

161.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 124 of this Complaint with the same force and effect as if fully set forth herein.

162.    Defendants interfered with Plaintiff's right to be free from discriminatory employment practices and his right to reasonable accommodation by subjecting him to unwarranted disciplinary actions, termination, threats of terminations, increased scrutiny, unique instructions and standards, deprivation of pay and constructive discharge, in violation of NYCHRL §8 - 107(19).

32

163.   In taking the above described discriminatory actions, Defendants acted with malice and reckless indifference to Plaintiff's rights under the Administrative Code.

164.   Plaintiff has lost wages, other benefits and compensation, has suffered and continues to suffer mental anguish, emotional distress, humiliation and other compensable injuries as a result of Defendants' discriminatory practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bruce Jones respectfully requests that a judgment be granted as follows:

a.   Declaring the acts and practices complained of herein to be violations of 42 U.S.C. §1981, and the New York City Human rights Law;

b.   Enjoining and permanently restraining these violations of law;

c.   Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

d.   Directing defendants to place Plaintiff in the position he would have occupied but for Defendants' unlawful conduct, and making him whole for all earnings and other benefits he would have received but for Defendant's unlawful conduct, including but not limited to wages, commissions, other lost benefits, loss of good will, and interest thereon;

e.   Directing Defendants to pay Plaintiff compensatory damages, including damages for his mental anguish, denial of life's pleasures, pain and suffering and humiliation, and damage to reputation;

f.   Awarding Plaintiff the costs of this action together with reasonable attorney fees, to the fullest extent permitted by law;

g.   Directing Defendants to pay punitive damages; and

h.      Granting such other relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully

demands that this proceeding be tried to a jury.

Dated:          New York, NY
                October _____, 2012

                                              Respectfully Submitted

                                     By:      _____
                                              Felicia Nestor
                                              1501 Broadway, 12th Floor
                                              New York, NY 10036
                                              fn@fnestorlaw.com
                                              (646) 571-2214 Phone
                                              (866) 407-5277 Fax